UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

OCEAN WALK, LTD., PATRICK McEVOY
and JOANNE McEVOY,

                Plaintiffs,                        **MEMORANDUM OF DECISION
AND ORDER**

    -v.-                                    03-CV-5271 (DRH) (ARL)

THOSE CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON Subscribing to
Policy No. 595/NO313790R,

                Defendants.
_____

**Appearances:**

**For the Plaintiffs:**
**Angela C. DeCespedes**
**Renee Jennifer Levine**
Weg & Meyers, P.C.
Federal Plaza
52 Duane Street, 2nd Floor
New York, NY 10007

**For the Defendants:**
**Gilbert M. Coogler**
**Nicholas L. Paone**
White Fleischner & Fino
140 Broadway, 36th Floor
New York, NY 10005

**HURLEY, Senior District Judge:**

       This case arises from the ashes of a fire, so to speak. Plaintiffs owned property that the

Defendants insured. After a fire at the property, Plaintiffs made an insurance claim, but

Defendants denied the claim on the basis that the Plaintiffs breached the insurance contract. This

action followed.

Plaintiffs Patrick McEvoy, Joanne McEvoy, and Ocean Walk, Ltd. (collectively, "Plaintiffs") brought suit against Defendants Those Certain Underwriters at Lloyd's of London subscribing to Policy NO. 595/NO313790R ("Defendants") claiming breach of an insurance contract based on Defendants' failure to reimburse Plaintiffs for loses allegedly covered by an insurance policy issued by Defendants. Defendants raised several affirmative defenses, arguing they are not liable to Plaintiffs under the subject insurance policy because of Plaintiffs' misrepresentations in procuring the subject insurance and because of Plaintiffs' breaches of conditions and warranties made under the contract. Presently, Defendants have moved for summary judgment on Plaintiffs' entire breach of contract claim and Plaintiffs have moved for partial summary judgment on selected affirmative defenses raised by Defendants. Plaintiffs have also requested the Court direct the parties to mediate their dispute. Defendants ask that the motions for summary judgment be resolved first before any mediation commences. For the reasons stated below, Defendants' Motions for Summary Judgment is DENIED and Plaintiffs' Motion for Partial Summary Judgment is DENIED. Plaintiffs' request for mediation is GRANTED.

## MATERIAL FACTS

In compliance with the Local Rule 56.1, Plaintiffs and Defendants have each filed a Local Rule 56.1 Statement of Facts in support of their respective Motions for Summary Judgment; each has also filed a responding Counter-Statement of Facts. (*See* Pls.' Statement of Facts Pursuant to Local Rule 56.1 ("Pls.' Facts"); Defs.' Counter-Statement of Material Facts in Opp'n. to Pls.' Mot. Summ. J. "Defs.' Opp'n")) Additionally, the parties have filed voluminous exhibits in

support of their respective positions. The following summary of facts is undisputed, except where otherwise noted.

Plaintiffs Patrick and Joanne McEvoy are in the business of real estate development. They were also the principal owners of Plaintiff Ocean Walk, Ltd., a seasonal bar and restaurant located on Fire Island, New York. In addition to owning the bar and restaurant, Plaintiffs owned the property on which the establishment sits, *i.e.*, 177 Ocean Walk, Cherry Grove, Fire Island, New York (the Property"), having purchased it in January 1999. After buying the Property, the Plaintiffs renovated it, spending approximately $1.7 to $1.8 million on the renovations. (*See* Pls.' Facts at ¶ 3.)

Defendants are a consortium of Lloyd's underwriters that provided the subject insurance coverage on the Property. Defendants contend that the value of the Property post-renovation was "only in the range of $1.4 - $1.5 million." (Defs.' Opp'n at ¶ 3). When the renovations were complete, Plaintiffs sought to sell the Property, but operated the bar and restaurant while the Property was being marketed.

Once they purchased the Property, Plaintiffs secured insurance on the Property through their insurance broker, Maran Associates ("Maran"), and Maran employee Thomas Crowley. The insurance coverage was: (1) underwritten by Lloyd's of London; (2) was for a one-year period; (3) had a liability limit of $750,000; and (4) contained no warranties. The policy was renewed yearly until 2002.

In early January 2002, through their insurance broker, Plaintiffs sought to renew their insurance with a much higher liability limit for the Property, to wit, $3.13 million (hereinafter, the "2002 Policy"). There is a dispute as to whether, since acquiring the Property, the Plaintiffs

have always purchased their property insurance from Defendants. (*See* Pls.' Facts ¶¶ 8-10; Defs.' Opp'n ¶¶ 8-10.) Defendants claim that "a different group of Lloyd's syndicates" issued the 2000 and 2001 policies. (*See* Defs.' Opp'n ¶¶ 8-10.) Furthermore, Defendants dispute whether the approving underwriter, if aware of the Property's true market value–claiming Plaintiffs substantially overstated the Property's value–would have agreed to bind coverage. (*See* Defs.' Opp'n ¶ 13; *see also id.* at ¶ 16 (disputing Plaintiffs' assertion that fair market value of Property was $3.1 million just prior to fire). Moreover, Defendants dispute whether the requested increase in coverage was based on the Plaintiffs seeking refinancing of an existing mortgage. (*See* Pls.' Facts ¶ 14; Defs.' Opp'n ¶ 14.) The 2002 Policy was issued for a period commencing on January 13, 2002, through January 13, 2003.

Regarding the Plaintiffs' 2002 application for insurance: Plaintiffs state that the application they submitted to Defendants "did not contain any misrepresentations," (Pls.' Facts ¶ 17), but that if there were any misrepresentations, they were not material because "they did not cause Defendant [(sic)] to change or delete any coverage," (*id.* at ¶ 18.) There was no inquiry in the application "as to why Plaintiffs wanted to increase their policy limits." (*Id.* at ¶ 19.) Defendants counter that, indeed, Plaintiffs' application did contained material misrepresentations of fact. (*See* Defs.' Opp'n at ¶¶ 17-18 (citing, *inter alia*, Affidavit of Jonathan Marshall at ¶¶ 3-5)). Moreover, the application asks for "information as to building coverage limits requests and it is implicit in this application and understood that Plaintiffs would provide true and accurate answers," (*id.* at ¶ 19), but that Plaintiffs gave a false reason for requesting the increased coverage, (*see id.*).

The 2002 Policy was bound by Defendants by a "Cover Note issued by Besso, Ltd. ("Besso") on or about January 13, 2002." (Pls.' Facts ¶ 21; *see* Defs.' Opp'n ¶ 21.) However, Defendants dispute Plaintiffs' claim that they (Plaintiffs) immediately requested a copy of the 2002 Policy after receiving the Binder. (*Cf.* Pls.' Facts ¶ 22, *with* Defs.' Opp'n ¶22). And, while Defendants "do not dispute the contention that the policy was mailed to Plaintiffs or their agent on May 20, 2002," (Defs.' Opp'n ¶ 23), they contest the implication that mailing of the Policy was late or outside the ordinary course of business. (*See* Defs.' Opp'n ¶23.) Relatedly, Plaintiffs assert that they learned of the specific warranty language only after the fire occurred, when they received a copy of the 2002 Policy. (*See* Pls.' Facts ¶¶ 24, 33.) Yet, Defendants controvert this fact, stating that Plaintiffs and Thomas Crowley "were in possession of the Cover Note, Binder, and/or Confirmation of Coverages which specifically advised that the 'Sprinkler Maintenance Warranty' and 'Central Station Alarm Warranty' were included in the Policy, and that Plaintiffs are required to comply with those warranties or no coverage is provided." (Defs.' Opp'n ¶¶ 24, 33; *see also id.* at 52 (refuting Plaintiffs' assertion that warranties not in full force and effect on date of fire because Plaintiffs did not have knowledge of them)).

There is dispute whether Plaintiffs performed spring maintenance and clean-up in anticipation of the Summer 2002 season; Defendants claim Plaintiffs failed to perform maintenance on the Property's sprinkler system and did not repair broken windows on the Property. (*See* Pls.' Facts ¶ 4; Defs.' Opp'n ¶ 4.) Along those lines, Plaintiffs contend that they sought to have the alarm system regularly inspected to ensure functionality, but that the alarm company "declined to inspect" the Property until the spring, when the ferry was regularly servicing Fire Island. (*See* Pls.' Facts ¶¶ 31, 32.) Defendants challenge this alleged fact,

asserting that it was Plaintiffs who refused to enter into an annual inspection contract with the alarm company; the alarm company "did not refuse to inspect the premises." Rather, limited ferry service hindered the alarm company's access to the Property. (*See* Defs.' Opp'n ¶¶ 31, 32.)

Regarding the 2002 Policy's "caretaker provision": Plaintiffs allege that on March 7, 2002, through their agent, Defendants became aware that there was no caretaker at the Property, but that Defendants continued to insure the Property. (*See* Pls.' Facts ¶¶ 35-36.) Since this provision is not a warranty, it imposes no obligations on Plaintiffs. (*See id.* at ¶ 37.) Defendants counter that its agents–Besso and NIF Services ("NIF")–were agents only as to issuance of the Policy, not as to compliance therewith. (*See* Defs.' Opp'n ¶¶ 35-36.) In any event, Plaintiffs were required to comply with the "caretaker provision" since Defendants would not have issued the subject Policy "if Plaintiffs had not made the representation that the premises would be occupied year round by a caretaker." (*Id.* at ¶ 37.) Plaintiffs dispute whether Besso and NIF (and certain of their employees) had authority to underwrite insurance policies or bind Defendants to coverage. (*See* Pls.' Facts ¶¶ 38-40.)

On March 24, 2005, Plaintiff Patrick McEvoy showed the Property to James Jansen, a person to whom McEvoy leased the Property for the Summer 2002 season. A week prior to this showing, the Property was vandalized, with several windows and a glass door being broken. The parties dispute whether Plaintiffs exercised due diligence in immediately boarding up the broken glass. (*See* Pls.' Facts ¶ 44; Defs.' Opp'n ¶ 44.) Likewise, Defendants dispute Plaintiffs claims that, because of difficulties getting to the Property, "it proved difficult to get proper contractors to the premises to repair the windows and door." (Pls.' Facts ¶ 45; *see* Defs.' Opp'n ¶ 45.) Further, Defendants contest Plaintiffs' asserted fact that, because proper repairs could not be

made, the burglar alarm system could not be set, as wind coming through the windows and doors would trigger the alarm. (*See* Pls.' Facts ¶¶ 46, 49; Defs.' Opp'n ¶¶ 46, 49.) Similarly, while not disputing that Property's sprinkler system was properly installed, Defendants do dispute Plaintiffs' contention that the Property's sprinkler system was in full working order on March 24, 2002, (*see* Pls.' Facts ¶ 51), since "all the available evidence in the record establishes that the sprinkler system was not in working order at the time of the fire." (Defs.' Opp'n ¶ 51.)

On March 24, 2002, at approximately 11:50 P.M., a fire occurred at the Property. "[T]he central station was notified of the fire via an alarm." (Pls.' Facts ¶ 56.) Thereafter, the Arson Squad of the Suffolk County Police Department conducted an investigation into the cause and origin of the fire. Among other things, the investigation uncovered that the water supply to the Property's sprinkler system was turned off at the curb.

Defendants dispute Plaintiffs' claimed damages caused by the fire. (*See* Defs.' Opp'n at ¶¶ 54-55.) They further dispute Plaintiffs' assertion that the Arson Squad detective did not identify any suspect, stating "Plaintiff Patrick McEvoy has been considered a possible suspect in the arson investigation and has never been ruled out as a suspect." (*Id.* at ¶ 60.)

Plaintiffs gave timely notice of the loss caused by the fire, but Defendants dispute that proof of loss was adequate or timely. (*See id.* at ¶ 66.)

## PROCEDURAL BACKGROUND

In July 2003, Plaintiffs made an insurance claim to Defendants, submitting a proof of loss statement. Receiving no response to their insurance claim, in October 2003, Plaintiffs commenced an action for breach of the insurance contract in New York State Supreme Court.

On the basis of diversity jurisdiction, Defendants removed the action to federal court on October 20, 2003. There is no dispute that New York State law is applicable here.

In their Answer, Defendants allege that they are not the same group of underwriters that previously insured Plaintiffs. Moreover, Defendants assert that the 2002 Policy was not a renewal policy; it was a new policy, including new conditions and requirements, such as the alarm warranty, the sprinkler maintenance warranty, and the caretaker provision. Defendants also posit that Plaintiffs made material misrepresentations in their insurance application and, but for those misrepresentations, Defendants would not have issued the policy it did. Furthermore, Defendants contend that Plaintiffs did not strictly comply with the new requirements of the 2002 Policy. Therefore, because of Plaintiffs' alleged breaches, Defendants were justified in denying coverage for the damage caused by the March 2002 fire.

Prior to the parties moving for summary judgment, Defendants moved for judgment on the pleadings (doc. #15) as to Plaintiffs' allegations of: (1) violation of New York State's Code of Rules and Regulations § 216.6, entitled "Standards for prompt, fair and equitable settlements;" and (2) violation of good faith and fair dealing under the insurance contract. Plaintiffs also sought a total of $3.5 million in consequential damages for loss of a buyer or rental income, together with interest, costs and disbursements. The Court granted Defendants' motion (doc. #46) because there is no private cause of action under 11 N.Y.C.R.R. § 216.6 and because New York State does not recognize a cause of action for bad faith denial of insurance coverage. Further, finding the 2002 Policy did not contemplate recovery for such losses, the Court also found Plaintiffs were precluded from recovering consequential damages and attorney's fees. All that remains of Plaintiffs' complaint is their breach of contract claim.

Defendants now seek summary judgment dismissing Plaintiffs' complaint in its entirety. (*See* Defs.' Mem. Of Law in Support of Mot. Summ. J. at 1 ("Defs.' S.J. Mem.").) Defendants put forth three main arguments in support of their summary judgment motion: (1) Plaintiffs breached the alarm and sprinkler maintenance warranties contained in the 2002 Policy and the law requires strict compliance of those warranties; (2) Plaintiffs made material misrepresentations in their application for the subject Policy and, therefore, the Policy is void; and (3) Plaintiffs' failure to have a caretaker at the Property and failure to have daily security patrol of the Property was in breach of the Policy's provisions and Plaintiffs' claim that they would have both a caretaker and daily security patrol was a misrepresentation made in procuring coverage.

Conversely, Plaintiffs seek partial summary judgment dismissing three categories of Defendants' affirmative defenses: (1) those affirmative defenses (*i.e.*, the second, third, fourth, fifth, and sixth) claiming that Plaintiffs made material misrepresentations in applying for insurance when they sought to raise the liability limit in January 2002; (2) the affirmative defense asserting that Plaintiffs breached the alarm and sprinkler maintenance warranties, as well as failed to abide by a "caretaker provision", all captioned in the Policy's Cover Note (*i.e.*, Defendants' tenth affirmative defense); and (3) the affirmative defense contending that Plaintiffs directly or indirectly caused the subject fire to take place (*i.e.*, Defendants' first affirmative defense). (*See* Pls.' Notice of Motion for Summ. J. at 1-2.) In support of their motion, Plaintiffs raise five main points: (1) others with whom Plaintiffs interacted, to wit, Besso and NIF were agents of the Defendant; thus, information known to the agents must be imputed to Defendants; (2) there is no evidence suggesting Plaintiffs made any material misrepresentations in their

application for insurance; (3) Plaintiffs did not breach any warranties in the policy; (4) the "caretaker" condition is not a viable defense to avoid coverage; and (5) there is no evidence of arson, so Defendants cannot use that as a defense.

The Plaintiff fine-tune their arguments in response to Defendants' motion for summary judgment: (1) since they were not aware of the specific language of the 2002 Policy–specifically, the alarm and sprinkler maintenance warranties–until after the fire, Plaintiffs cannot be held to have breached conditions of the Policy; (2) assuming a warranty was breached; Plaintiffs did not materially breach such warranty; and (3) Plaintiffs did not make any material misrepresentations in the insurance application. (*See* Pls.' Mem. Of Law in Support of Mot. Summ. J. ("Pls.' S.J. Mem.").)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986 ); *Wilkinson v. Russell*, 182 F.3d 89, 96-97 (2d Cir. 1999). The Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995); *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). At its core, the Court's function in deciding a motion for summary judgment is "issue finding," not "issue resolution." *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Vill. of Kiryas Joel Local Dev. Corp. v. Ins. Co. of N. America*, 996 F.2d 1390,

1392 (2d Cir. 1993) ("Our role is not to weigh the evidence or make determinations of credibility but to 'determine whether there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 249)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in its pleadings, on conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

## DISCUSSION

A.   Defendants' Motion for Summary Judgment

Defendants raise three main arguments in support of their motion for summary judgment. They first argue that Plaintiffs' breach of the alarm and sprinkler maintenance warranties; as strict compliance is required, Plaintiffs' breaches entitle Defendants to summary judgment. (*See* Defs.' S.J. Mem. at 8-19.) Defendants (1) discuss insurance warranties generally (*see id.* at 8-12); (2) argue Plaintiffs' failed to regularly maintain the sprinkler system according to allegedly

applicable government regulations (*see id.* at 13-16); (3) failed to keep the sprinkler system in working order (*see id.* at 16-18); and (4) did not set the alarm on the date of the fire (*see id.* at 18-19).

Defendants' second argument is that Plaintiffs' material misrepresentations in procuring insurance precludes coverage as a matter of law. (*See id.* at 20-30.) Specifically, Defendants question Plaintiffs' claim regarding refinancing and a "bank" requiring increased coverage limits. (*See id.* at 21-26.) Defendants assert that, but for Plaintiffs' material misrepresentations, they would not have agreed to provide insurance coverage. (*See id.* at 26-30.)

Finally, Defendants argue that Plaintiffs' failure to have a residential caretaker on the property and failure to hire daily security patrol was both a misrepresentation in procuring and a breach of the 2002 Policy. (*See id.* at 30-32.) Because of these breaches, Defendants are not liable to Plaintiffs for property damage caused by the fire.

Having reviewed Defendants' arguments, the Court views them as boiling down to two overarching issues: (1) whether Plaintiffs made material misrepresentations in their application for the subject insurance; and (2) whether Plaintiffs breached warranties and other provisions of the 2002 Policy. We will first turn to the material misrepresentation arguments and then to the breach arguments.

1.      *Material Misrepresentations*

Defendants vehemently argue that Plaintiffs made material misrepresentations in their insurance application, to wit, the value of the Property (which Defendants claim is greatly overstated), the maintenance and protection of the Property via an alarm system, daily patrol of the Property, maintenance of a sprinkler system, and the presence of a year-round caretaker. (*See*

Defs.' S.J. Mem. at 20-30; *see also* Defs.' Answer, Second–Sixth Affirmative Defenses, Exh. OO, attached to Zola Affirmation.)  The Court will first address material misrepresentation generally and then discuss Defendants' more finite material misrepresentations arguments thereafter.

(a)     Material Misrepresentations Generally

Under New York law, an insurance policy issued in reliance on a material misrepresentation is void from its inception. *Republic Ins. Co. v. Masters, Mates, & Pilots Pension Plan*, 77 F.3d 48, 52 (2d Cir. 1996) (citing N.Y. Ins. Law § 3105; further citations omitted); *see also Vella v. Equitable Life Assur. Soc. of U.S.*, 887 F.2d 388, 391 (2d Cir. 1989) (collecting N.Y. cases); *Carpinone v. Mutual of Omaha Ins.*, 265 A.D.2d 752, 754 (N.Y. 1999) (instructing that under New York law, where insured makes material misrepresentation in insurance application, insurer entitled to rescind insurance policy).  "The burden of establishing the existence of a material misrepresentation is on the insurer."  *In re Worldcom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 465 (S.D.N.Y. 2005) (citing *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 119 (2d Cir. 1999)).

> New York Courts have consistently held that to meet the burden of proof on materiality, an insurer must submit evidence of its underwriting practices with respect to similar applicants.  A court may not rely merely on statements by representatives of the insurer that it would not have issued the policy but for the representation.

*First Fin. Ins. Co.*, 193 F.3d at 119 (quoted by *Worldcom*, 354 F. Supp. 2d at 465).

In the New York case, *Carpinone v. Mutual of Omaha Insurance*, the court stated, "The materiality of an applicant's misrepresentation is ordinarily a factual question unless the insurer proffers clear and substantially uncontradicted evidence concerning materiality, in which event

13

the matter is one of law for the court to determine." 265 A.D.2d at 754 (citing *Process Plants Corp. v. Beneficial Nat'l Life Ins. Co.*, 53 A.D.2d 214, 216, *aff'd* 42 N.Y.2d 928 (further citations omitted)). In that regard,"to establish the materiality of a misrepresentation as a matter of law, [the insurer] [is] required to present documentation concerning its underwriting practices such as its underwriting manuals, rules or bulletins which pertain to insuring similar risks." *Id.* (citations omitted). Thus, where the insurer presented only an affidavit of its risk director and chief underwriter, "who merely asserted that–based upon [the insurance company's] underwriting guidelines then in effect–[the insurance company] would not have issued" the subject insurance policy if the insured had been forthright in his insurance application, the court concluded this evidence was insufficient to establish as a matter of law that the insured's misrepresentations were material. *See id.* at 754-55.

In the instant case, to establish Plaintiffs' material misrepresentations, Defendants rely upon the Affidavit of Jonathan Marshall (hereinafter, "Marshall Aff."). At the time Plaintiffs procured insurance coverage under the 2002 Policy, Marshall was an underwriter for AGM Syndicate 2488, ACE-INA UK Limited. (Marshall Aff. ¶1.) Under oath, Marshall contends that, having been presented with Plaintiffs' application for insurance, he would not have agreed to bind the coverage under the policy: (1) "if I had information that the valuation of the building was substantially overstated" (*id.* ¶3); and (2) "if I had information that the sprinkler or central alarm systems were not in place, maintained and functioning in working order"(*id.* ¶4). In short, but for the information provided by Plaintiffs, Marshall "would not have agreed to bind coverage under the policy, or I would have required material changes to the coverage, such as higher premium or higher deductibles." *Id.* ¶5. Additionally, Marshall states: "The policy issued to

[Plaintiffs] was a new line of coverage and was not a renewal policy." *Id.* ¶ 6. Finally, Marshall concludes, "There were no written underwriting guidelines at any time pertinent to the subject application. My underwriting determinations were based on experience and the information provided during the application process." *Id.* ¶ 7.

Having examined Marshall's Affidavit through the prism of applicable case law, the Court finds Defendants have not meet their burden of proof on materiality. As *Worldcom* instructs, this Court cannot rely merely on the statements of Marshall that he would not have agreed to bind insurance under the Policy but for Plaintiffs' representations. *See Worldcom*, 354 F. Supp. 2d at 465; *Carpinone*, 265 A.D.2d at 754-55. Rather, "an insurer must submit evidence of its underwriting practices with respect to similar applicants." *Id.* (quoting *First Fin. Ins. Co.*, 193 F.3d at 119). Thus, the Court is unpersuaded by Marshall's seemingly self-serving statement that there were no written guidelines in January 2002 upon which he could rely in assessing Plaintiffs' insurance application. First, the Court is skeptical that there were *no* underwriting manuals, rules, bulletins, or other forms of guiding documentation pertaining to insuring similar risks upon which Defendants could have relied. Second, even if that were the case and Marshall's underwriting determination were based on his experience, the evidence in record is inconclusive regarding Marshall's claimed experience. The Court requires more than Marshall's conclusory statement; it needs evidence of Marshall's underwriting experience to find Defendants have meet their burden of proof on material misrepresentation. If such experience had been provided with sufficient detail in Marshall's Affidavit (*i.e.*, affidavit testimony regarding Marshall's underwriting practice with respect to similar applicants), the Court may have been able to make that finding. Yet, that is not in the record here. Thus, lacking the

requisite clear and substantially uncontradicted evidence, there is no basis for a finding of material misrepresentations as a matter of law.

Therefore, as to Defendants' material misrepresentation argument (*see* Defs.' S.J. Mem. at 20-30), the motion is denied. Defendants may present evidence at trial to establish its underwriting procedures with respect to similar applicants in furtherance of its affirmative defenses of material misrepresentation (*i.e.*, its Second-Sixth Affirmative Defenses). It is for the fact-finders to determine whether Defendants would not have issued the subject insurance Policy, but for the alleged material misrepresentations.

(b)     Fair Market Value as a Material Misrepresentation

Defendants argue that they "never would have issued the Policy for $3,100,000 in limits had the issuing underwriter known that the building valuation had been substantially overstated . . . ." (Defs.' S.J. Mem. at 20.) Clearly, the valuation of the Property is woven within the general argument of material misrepresentation. Yet, it is a difficult task to establish valuation as a matter of law; rather, the determination of value is normally one for the fact-finder. *See generally Eisenberg v. CIR*, 155 F.3d 50, 53 n.9 (2d Cir. 1998) ("A determination of fair market value, being a question of fact, will depend upon the circumstances in each case." (quoting Revenue Ruling 59-60, ¶3.01)); *Am. Soc. of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 568 (2d Cir. 1990) ("Fair market value is a factual matter, albeit a hypothetical one."); *Silverman v. CIR*, 538 F.2d 927, 933 (2d Cir. 1976) (noting that valuation is a factual determination to be made on all the elements of a particular case) . Indeed, the current record is replete with contradicting valuations for the Property, none of which is

conclusive.[1]  Since the issue of valuation is intricate to Defendants' argument of material

misrepresentation, and since this is a factual determination, there is no basis, as a matter of law,

to determine the value of the Property.  Thus, Defendants may proceed to present evidence to the

fact-finder on the issue of the Property's value in support of its argument that Plaintiffs

materially misrepresented the value of the Property in procuring insurance coverage from

Defendants.  (*See* Defs.' S.J. Mem. at 26-30.)

        (c)       The Party Requiring Higher Coverage as a Material Misrepresentation

Defendants also raise the issue of *who* wanted the increased insurance coverage as

another material misrepresentation made by Plaintiffs.  (*See Id.* at 21-26.  This issue becomes

relevant in light of Defendants' assertion of arson as an affirmative defense.  (*See* Defs' Answer,

First Affirmative Defense, Exh. OO, attached to Zola Affirmation.)  Defendants argue that, by

increasing the liability coverage, Plaintiffs were financially motivated to cause the fire.  Plaintiffs

contest this argument, claiming they sought higher coverage based upon advise they received

regarding potentially refinancing the Property.

A review of the record evidence does not answer the question of who requested the

increased insurance coverage.  Defendants point to the absence of any refinancing reference in

---

[1]For example, there is a 2000 Appraisal Report showing the Property's value at $1.4 million (*see* 2000 Appraisal Report, Exh. R, attached to Coogler Aff.).  There is also a September 16, 2003, Purchase & Sale Agreement that evinces a total purchase price of $1.605 million (*see* Sept. 16, 2003, Purchase & Sale Agreement, Exh. S, attached to Coogler Aff.).  However, the sale contemplated by the September 2003 Purchase & Sale Agreement was later rescinded because of Plaintiffs' misrepresentations about Property (*see* Exh. T, attached to Coogler Aff.).  The record also contains an October 2004 Multiple Listing that lists the Property at $1.4 million (*see* Exh. W, attached to Coogler Aff.).  There is also an undated letter from Realtor Dan Ryan stating Ryan had the Property listed at $3.1 million "during the time frame between 2001 and 2002" and there was active interest in the Property (Exh. Z, attached to Zola Affirmation).

Plaintiffs' mortgagee's[2] records to prove that Plaintiffs did not pursue any refinancing. (*See, e.g.*, Depo. of Edward Murphy (officer of Banco Popular), Exh. B at 27, attached to Coogler Affidavit.) This information is not conclusive, though, especially since Plaintiffs could have pursued refinancing with another financial institution.[3] Indeed, Plaintiffs point to some (albeit attenuated) evidence that supports their assertion that they did seek financial advice and were advised to seek higher insurance coverage. (*See, e.g.*, Depo. of Thomas Crowley, Exh. B at 51:15-52:4, attached to Zola Affirmation (recalling that a bank, the name of which he could not recall, was requiring higher insurance limit); *but see* Depo. of John Ebbecke at 8-9, Exh. C, attached to Coogler Affidavit (testifying that he did not provide Plaintiffs with any financial advise regarding the Property).) While not conclusive, this inference is sufficient to raise a genuine dispute of material fact, thereby forestalling summary judgment. *See Gallo*, 22 F.3d at 1224 (instructing that court's function in deciding motion for summary judgment is "issue finding," not "issue resolution").

        (d)      Presence of Year-Round Caretaker as a Material Misrepresentation

Defendants claim another example of material misrepresentation by Plaintiffs is their representation of a year-round caretaker on the Property. (*See* Defs.' S.J. Mem. at 31-32.) A

---

[2] It is undisputed that Banco Popular was the record mortgagee of the Property.

[3] Moreover, Defendants would not have to prove a negative to support their motion for summary judgment on this issue *if* Plaintiffs had to prove material misrepresentation as to who required the increased insurance coverage. *See Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" (quoting *Celotex Corp.*, 477 U.S. at 324)). However, proving material misrepresentation is Defendants' burden. *See Carpinone*, 265 A.D.2d at 754.

preliminary review of the record evidence shows that when Plaintiffs were in the process of securing insurance coverage in early January 2002, one of the issues discussed was protection of the Property. (*Cf.* Facsimile from Mike Brooker, NIF, to Tom Crowley, Maran Assocs. (Jan. 8, 2002) (requesting, *inter alia*, "complete details on protection when restaurant is in operation and when it is closed"), Exh. DD, attached to Zola Affirmation, *with* Facsimile from Thomas J. Crowley, Maran Assocs., to Mike Brooker, NIF (Jan. 9, 2002) (stating, "Building is open from May to October. When not open they have a security patrol who goes by daily and the second building on premises is occupied year round by a caretaker."), Exh. EE, attached to Zola Affirmation). The Binder contained no indication of the caretaker provision, but that provision is included in the Cover Note under the "Information" section. (See *infra* for expanded discussion of terms contained in Binder and Cover Note.) This lack of consistency between the Binder and Cover Note on an allegedly important provision raises some question of the provision's significance. At a minimum, it raises an issue for the fact-finder to resolve. The Court will not determine that, as a matter of law, Plaintiffs' caretaker representation was a material misrepresentation.

2.      *Whether the Policy's Warranties and Other Provisions Were Breached*

Defendants' second major argument is that Plaintiffs breached the alarm and sprinkler maintenance warranties in the insurance contract, as well as the caretaker and daily security patrol provisions. (*See* Defs.' S.J. Mem. at 13-19, 30-31.) Before a determination can be made as to whether the warranties and provisions have been breached, though, there must be a determination as to the meaning of the warranties and provisions.

19

(a)     The Controlling Insurance Contract

On January 14, 2002, a Binder Printout was generated and faxed, presumably to Plaintiffs' insurance broker, Thomas Crowley. (*See* Binder Printout (Jan. 14, 2002), Exh. KK, attached to Zola Affirmation (evidencing that original facsimile transmittal line unreadable as to sender and recipient); *cf.* Depo. Testimony of Thomas Crowley at 65:11-68:7 (Mar. 15, 2005), Exh. B, attached to Zola Affirmation (testifying to his belief that the Binder Printout was received by his office on January 14, 2002)). Within the vertical listing of the deductible, exclusions to coverage, and identifying Banco Popular as the mortgagee on the Property, the Binder also listed "Sprinkler Maintenance Warranty" and "Central Station Alarm Warranty". At the bottom of the Binder, the follow statement was printed: "This document is evidence that insurance described above has been placed against which policies will be issued, subject to all the terms and conditions of the policy. IMMEDIATE ADVICE MUST BE GIVEN OF ANY DISCREPANCIES, INACCURACIES OR NECESSARY CHANGES." (*See id.* (emphasis in original).) There is no evidence in the record that Plaintiffs ever notified Defendants of any discrepancies, inaccuracies or necessary changes that needed to be made to insurance coverage based upon the Binder.

Also on January 14, 2002,[4] Besso sent NIF a copy of the Policy's Cover Note. (*See* Cover Note (dated Feb. 13, 2002), Exh. G, attached to Zola Affirmation). Under the "Conditions" section (p.2 of Cover Note), among the many conditions listed, were the captions "Sprinkler Maintenance Warranty" and "Central Station Alarm Warranty"; under the

---

[4] There is evidence in the record that the "February 14" date on the Cover Note was a typographical error. (*See* Depo. Michael Brooker at 47-48, Exh. I, attached to Zola Affirmation.) The Court will assume that the Cover Note was dated January 14, 2004.

"Information" section (p.2 of Cover Note) was, among other notations, the notation: "Open from May - October. When closed daily security patrol on restaurant and residential caretaker in home year round;" and under the "Reminder" section (p. 3 of Cover Note), was the concluding statement: "The Assured must comply with any warranty, subjectivity and/or condition contained within this insurance (whether express or implied). Failure to do so *may* discharge Underwriters from all liability." (Emphasis added.) It is undisputed that Plaintiffs did not receive a copy of the full Policy until after the fire.

Based on the fact scenario of this case, together with applicable case law, the Court must turn its attention to the Binder and the Cover Note[5] in determining whether there has been a breach in this case. *See, e.g., World Trade Center Props. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 166-67 (2d Cir. 2003). In *World Trade Center Properties*, the Second Circuit noted that "[w]hile not all of the terms of the insurance contract will be set forth in the binder, a binder is nevertheless a fully enforceable 'present contract of insurance.'" *Id.* at 167 (quoting *Ell Dee Clothing Co. v. Marsh*, 247 N.Y. 392, 160 N.E. 651, 652 (1928)); *see also Lipman v. Niagara Fire Ins. Co.*, 121 N.Y. 454, 24 N.E. 699, 700 (1890) (instructing that a binder is a "short method of issuing a temporary policy for the convenience of all parties, to continue until the execution of the formal one") (quoted in *World Trade Center Props.*, 345 F.3d at 166). Reiterating this point, the circuit court quoted the New York Court of Appeals:

_____

[5] A cover note is a form of a binder. *See* 1A Couch on Ins. §13:1 (3rd ed., *updated* 2006). A cover note "is generally used when insurance is placed with foreign companies." *Id.* at n.7. (*See also* Depo. of Peter Giles of Besso, Ltd. (Mar. 30, 2005) at 45, Exh. CC, attached to Zola Affirmation (testifying that a cover note confirms coverage has been bound)). The Court will consider the Cover Note in tandem with the Binder, but notes that Plaintiffs dispute whether they or Thomas Crowley, their insurance broker, ever received a copy of the Cover Note.

> [i]t has long been settled in this State that an insurance binder is a
> temporary or interim policy until a formal policy is issued. A
> binder provides interim insurance, usually effective as of the date
> of application, which terminates when a policy is either issued or
> refused.

*Id.* at 166 (quoting *Springer v. Allstate Life Ins. Co.*, 94 N.Y.2d 645, 710 N.Y.S.2d 298, 731

N.E.2d 1106, 1108 (2000)). Further, because of the insurance industry's common use of binders,

necessitated by recognized time constraints under which insurers must operate, courts recognize

the "cryptic nature of binders" and recognize "that many policy clauses are either stereotypes or

mandated by public regulation[; therefore, courts] are not loath to infer that conditions and

limitations usual to the contemplated coverage were intended to be part of the parties' contract

during the binder period." *Employers Comm. Union Ins. Co. v. Firemen's Fund Ins. Co.*, 45

N.Y.2d 608, 412 N.Y.S.2d 121, 384 N.E.2d 668, 670 (N.Y. 1978) (footnote omitted) (quoted in

*World Trade Center Props.*, 345 F.3d at 166). In other words, courts will assume that conditions

and limitations that are usual to the contemplated insurance coverage, *i.e.*, those that are

stereotypical and/or required by regulations, are to be considered included in the binder contract

as well. This does not answer whether the alarm warranty and the sprinkler maintenance

warranty were usual to the contemplated insurance coverage provided under the 2002 Policy.

The record before the Court evidences that the alarm warranty and the sprinkler

maintenance warranty in this case were included for the first time in the Binder of the 2002

Policy; no such warranties were contained in prior insurance policies that Plaintiffs had

previously purchased to cover the Property. (*Cf.* Binder for 2002 Policy, Exh. KK, attached to

Zola Affirmation, *and* 2002 Policy Cover Note, Exh. G, attached to Zola Affirmation, *and* 2002

Policy, Exh. E, attached to Zola Affirmation, *with, e.g.*, 2001 Policy, Exh. C, attached to Zola

Affirmation.)  Also based on the evidence presented, the Court finds that, as a matter of law, the

2002 Policy was a new policy, not a renewal policy; this finding is based on: (a) Plaintiffs having

to fill out an application for their request for higher insurance coverage (*see, e.g.*, Depo.

Testimony of Thomas Crowley at 50:2-6, Exh. B, attached to Zola Affirmation, *and* Commercial

Insurance Application (including notation–at top of second page–that policy was new purchase),

Exh. LL, attached to Zola Affirmation); (b) NIF documentation indicating the Policy as new (not

a renewal) (*see, e.g.*, Facsimile Quotation from Michael Brooker, NIF, to Maran Assocs., Attn.:

Danielle (Jan. 2, 2002) (containing handwritten notation, dated Jan. 7, 2002 "Advised Tom need

to withdraw Qt due to raised limit and N/R of Lloyd's contract.  Will remarket ASAP –"), Exh.

X, attached to Coogler Affidavit); and (d) Jonathan Marshall's affidavit testimony that the Policy

was a new line of coverage, not a renewal (*see* Marshall Aff. ¶ 6).  However, the question

remains whether the specific requirements of the alarm and security maintenance warranties were

fully communicated to the Plaintiffs.

(b)     The Terms Contained in the Binder and the Cover Note

The Court next turns to the terms contained in the Binder and the Cover Note.  Where

there is no ambiguity in an insurance term–whether within a binder or within a final policy–there

is no need to look beyond the policy.  *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Props,*

*LLC.*, ___ F. Supp. 2d ___, 2006 WL 2060464, at *5 (S.D.N.Y. July 25, 2006); *see also*

*Citigroup, Inc. v. Indus. Risk Ins.*, 336 F. Supp. 2d 282, 287 (S.D.N.Y. 2004), *aff'd*, 421 F.3d 81

(2d Cir. 2005).

> Ambiguity exists when a contract term suggests "more than one
> meaning when viewed objectively by a reasonably intelligent
> person who has examined the context of the entire integrated

> agreement and who is cognizant of the customs, practices, usages
> and terminology as generally understood in the particular trade or
> business."

*Id.* (quoting *World Trade Center Props.*, 345 F.3d at 184) (further citation omitted). However, determining whether the terms of an insurance contract are ambiguous "is a question of law for the court to decide." *SR Int'l Bus. Ins. Co.,* 2006 WL 2060464, at *5 (citing *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)). "When the terms of an insurance policy, whether a binder or final policy, 'are clear and unambiguous, the court should look no further than the language of the policy' itself." *Id.* (citing *Citigroup, Inc.*, 336 F. Supp.2d at 287). "However, 'extrinsic evidence is admissible to determine the parties' intentions with respect to the incomplete and unintegrated terms of a binder.'" *Id.* (quoting *World Trade Center Props.*, 345 F.3d at 184).

Defendants contend the language of the captions, "Central Station Alarm Warranty" and "Sprinkler Maintenance Warranty",standing alone,[6] are unambiguous and by their mere inclusion in the Binder (and the subsequent Cover Note), were sufficient to instruct Plaintiffs of their obligations under the 2002 Policy. (*See* Defs.' Opp'n Mot. at 2.) The Court is unpersuaded.

It is difficult to give meaning to the warranty captions–on their own–in a vacuum. Normally, insurance captions are considered "in tandem with the actual contractual provisions." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86-87 ( 2d Cir. 2002) (citing 2 Couch on Insurance § 18:18 (3d ed. 1997)). In this case, though, the Court is frustrated in such

---

[6] For clarity, the Court notes that the captions, "Central Station Alarm Warranty" and "Sprinkler Maintenance Warranty", were merely listed in both the Binder and Cover Note; there was no corresponding text to the warranty captions that would elucidate the requirements of these warranties.

an endeavor because it can consider only the Binder–the applicable interim policy–which lacked

any actual contractual provision language corresponding to the warranty captions. The Court

takes no issue with Defendants' statement of the law that a court will not find an ambiguity in an

insurance contract where none exists. *See United Capital Corp. v Travelers Indem. Co.*, 237 F.

Supp.2d 270, 274-75 (E.D.N.Y. 2002) ("A court may not, however, find ambiguity in an

insurance policy provision where none exists."); *see also K. Bell & Assocs., Inc., v. Lloyd's*

*Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (instructing that where an insurance contract is

unambiguous, courts are required to give effect to the contract as written). However, the Court

disagrees that a term or phrase, standing alone and not shown to be a term of art, such as the

"Central Station Alarm Warranty" and "Sprinkler Maintenance Warranty" captions, is *de facto*

unambiguous.

There is merit to Defendants' argument that the subject warranty phrases should have put

Plaintiffs on notice that there were additional conditions in the 2002 Policy with which they were

required to comply. In that vein, the record reflects that Thomas Crowley, who procured the

2002 Policy for Plaintiffs, was aware of these warranties, and that the McEvoys knew the Policy

had warranties pertaining to an alarm system and maintenance of a sprinkler system. (*See* Depo.

Thomas Crowley at 68:25-70:22, Exh. B, attached to Zola Affirmation.) However, there is no

evidence in the record that the subject warranty captions are terms of art (and Defendants do not

argue so) such that their requirements were universally understood. Likewise, there is

insufficient evidence in the record before the Court that these warranties were stereotypical and,

therefore, that Defendants can benefit from the presumption that the warranties were usual to the

contemplated insurance coverage. In fact, Plaintiffs direct the Court's attention to the deposition

testimony of Michael Brooker, Defendants' wholesale broker and agent.  (*See* Pls.' S.J. Mot. at 22-24.)  Booker testified that one would need the actual language of a warranty to know the exact terms and conditions being imposed upon an insured under the warranty as there are different warranties used in different insurance policies.  (*See id.*; Depo. Michael Brooker at 69-70, Exh. I, attached to Zola Affirmation.)  In sum, in examining both the Binder and the Cover Note, the Court finds the captions, "Central Station Alarm Warranty" and "Sprinkler Maintenance Warranty", standing alone, are ambiguous.  Therefore, it is necessary to consider extrinsic evidence; such evidence will assist the fact-finder in determining the Parties' intentions with respect to the warranties.  *See, e.g., McCostis v. Home Ins. Co. of Indiana*, 31 F.3d 110, 113 (2d Cir. 1994) ("When faced with ambiguity in an insurance policy, a reviewing court should consider extrinsic  evidence submitted by the parties to assist in determining their actual intent.") (citing *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985) (mem.)).  Finding the Parties' intentions regarding the subject warranties is a material disputed fact, the Court is precluded from stating as a matter of law that Plaintiffs breached those warranties.

Having reviewed Defendants' other arguments, the Court finds they are subsumed within those already addressed by the Court.  Therefore, to the extent not addressed, the Court now finds no basis to grant Defendants' motion for summary judgment based on their other arguments.


B.     Plaintiffs' Motion for Partial Summary Judgment

In their Motion for Partial Summary Judgment, Plaintiffs seek to preclude Defendants from using several of their affirmative defenses: Defendants' second through sixth affirmative defenses regarding material misrepresentations; Defendants' tenth affirmative defense stating

Plaintiffs breached the alarm and sprinkler maintenance warranties, and the caretaker provision; and Defendants' first affirmative defense regarding arson. Plaintiffs advance five arguments in support thereof: (1) others with whom Plaintiffs interacted, to wit, Besso and NIF, were agents of the Defendant; thus, information known to the agents must be imputed to Defendants; (2) there is no evidence suggesting Plaintiffs made any material misrepresentations in their application for insurance; (3) Plaintiffs did not breach any warranties in the policy; (4) the "caretaker" condition is not a viable defense to avoid coverage; and (5) there is no evidence of arson, so Defendants cannot use that as a defense. The Court turns to each of Plaintiffs' arguments.

1.    *Brokers or Agents?*

Plaintiffs would have this Court find that, as a matter of law, Besso and NIF were agents of Defendants. The significance of the agent designation is that the agent's principal is imputed with the knowledge of the agent. *See generally Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) (stating the general rule that, for purposes of assessing the principal's rights and liabilities vis-a-vis a third person, an agent's knowledge is imputed to the principal (citing Restatement (Second) of Agency §§ 9(3), 268, 272, 275 (1958) ). Though they do not articulate it well, it seems as though Plaintiffs are trying to assert that because Besso and NIF are Defendants' agents and because Besso and NIF knew of facts that Defendants are claiming Plaintiffs materially misrepresented, that Defendants are imputed with that knowledge as well. Defendants concede that Besso and NIF were their agents, but only as to the issuance of the 2002 Policy, not as to compliance therewith. (*See* Defs.' Opp'n ¶¶ 35-36.)

New York case law instructs that "a broker will be held to have acted as the insurer's agent where "'[t]here [is some] evidence of . . . action on the insurer's part, or facts from which a

general authority to represent the insurer may be inferred'" *U.S. Delivery Sys., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 265 A.D.2d 402 (N.Y. 1999) (bracketed addition in original; ellipsis in original; citations omitted)).  In the record at bar, the evidence supports Defendants' concession regarding Besso and NIF acting as their agent as to issuance of the 2002 Policy.  For example: (1) Peter Giles of Besso signed the Cover Note (printed on "Besso Limited" stationery) on behalf of Defendants binding the 2002 Policy (*see* Cover Note, Exh. G, attached to Zola Affirmation; *see also* Depo. Peter Giles at 45, Exh. CC, attached to Zola Affirmation (testifying that signature on Cover Note is publishing to the outside world that coverage is bound)); and (2) Michael Brooker of NIF Services identified himself as "Underwriter" for Insurance Company Lloyd's of London on the Fax Quotation, dated January 14, 2002 to Broker Maran Associates regarding Applicant Ocean Walk Ltd.  (*See* Exh. MM, attached to Zola Affirmation; *see also* Depo Michael Brooker at 64, Exh. I, attached to Zola Affirmation.)  Thus, in light of case law precedent, the record before it, and Defendants' admission to the same, there is no dispute Besso and NIF acted as Defendants' agents in issuing the Policy; therefore, as a matter of law, the Court finds the same.  This, however, does not resolve the disputed issue of whether Besso and NIF had continued authority to act as Defendants' agents in ensuring compliance with the Policy; that must be decided by the fact-finder.

2.     *Material Misrepresentations*

The Court has already addressed the applicable case law on material misrepresentation in response to Defendants' request for summary judgment on that issue.  (*See supra* Part A(1)(a)-(d).)  In sum, "materiality of an applicant's misrepresentation is ordinarily a factual question

28

unless the insurer proffers clear and substantially uncontradicted evidence concerning materiality, in which event the matter is one of law for the court to determine." *Carpinone*, 265 A.D. at 754. The Court's discussion is equally relevant to Plaintiffs' current argument that there is no evidence suggesting Plaintiffs made any material misrepresentations in their application for insurance. (*See* Pls.' Mem. S.J. 12-16.) Since the Court denied Defendants' motion for summary judgment on the grounds that Defendants had not established material misrepresentation as a matter of law, the Court also instructed that Defendants may present evidence at trial to establish its underwriting procedures with respect to similar applicants in furtherance of its affirmative defenses of material misrepresentation (*i.e.*, its Second-Sixth Affirmative Defenses). The converse of that ruling is that Plaintiffs are denied their request for partial summary judgement as to Defendants' Second through Sixth Affirmative Defenses.

3. *Breaches of Warranties*

Similarly, by addressing Defendants' arguments regarding breach of the 2002 Policy, the Court has also relatedly dealt with Plaintiffs' argument that Defendants' Tenth Affirmative Defense is predicated on warranties that allegedly did not exist and, therefore, cannot be enforced against Plaintiffs. (*See* Pls.' Mem. S.J. at 16.) No decision can be made as to whether the warranties were breached until there is first a determination as to what was meant by those warranties. Because of ambiguity in the Binder and Cover Note, extrinsic evidence must be considered to determine the intent of the Parties. Only after the fact-finder makes this determination can the issue of breach be examined. Thus, just as it is premature to grant Defendants summary judgment on the issue of the warranties being breached because relevant material issues of fact still needs to be determined, it is also impossible to grant Plaintiffs' partial

summary judgment seeking to preclude Defendants' use of their Tenth Affirmative Defense (*i.e.*, the defense of Plaintiffs' alleged breach of the warranties and the "caretaker" provision).

4.     *The "Caretaker" Provision as a Defense to Coverage*

The same logic applies to Plaintiffs' argument that the "caretaker" provision is not a viable defense because Plaintiffs were unaware of their specific obligations under that provision as in was set forth in the Cover Note (that Plaintiffs assert they never received). (*See* Pls.' Mem. S.J. at 29-30.) Until the fact-finder has an opportunity to consider extrinsic evidence regarding the Parties' intentions as to the "caretaker" provision, partial summary judgment in Plaintiffs' favor–allowing them to forestall Defendants' use of their Tenth Affirmative Defense–is improper.

5.     *No Evidence of Arson*

Finally, Plaintiffs argue that Defendants have failed to offer evidence showing Plaintiffs possessed the requisite motive to cause the fire; therefore, dismissal of Defendants' First Affirmative Defense (*i.e.*, the arson defense) is warranted.[7] (*See* Pls.' Mem. S.J. at 32.) To prove arson, not only must a party demonstrate the fire was incendiary, the party must also show by clear and convincing evidence that the accused committed the act in question. *See Chenango Mut. Ins. Co. v. Charles*, 235 A.D.2d 667, 669 (N.Y. 1997). However, "arson may be proved by circumstantial evidence." *Murray v. North Country Ins. Co.*, 277 A.D.2d. 847, 850 (N.Y. 2000); *see also Weed v. Am. Home Assur. Co.*, 91 A.D.2d 750, 751 (N.Y. 1982). New York courts have considered financial motivation as circumstantial evidence of intentionally causing or procuring the setting of a fire (*i.e.*, arson). *See id.*; *see also Home Ins. Co. of Indiana v. Karantonis*, 156

---

[7] There is no dispute that the fire was incendiary.

A.D.2d 844, 845 (N.Y. 1989).

Plaintiffs state, "At bar, Defendant has not produced one shred of evidence suggesting that Plaintiffs were involved in causing the fire, nor has it produced one scintilla of evidence establishing that Plaintiffs had motive to cause said fire." (Pls.' Mem. S.J. at 34.) The Court disagrees.

First, the deposition testimony of Heather O'Sullivan, upon which Plaintiffs rely, is uncertain. While Defendants do not dispute that O'Sullivan gave testimony that Defendants had no basis upon which to pursue an arson defense (*see* Depo. O'Sullivan at 124-25, Exh. FF, attached to Zola Affirmation), Defendants note that at the time of O'Sullivan's deposition, investigation of the loss was not complete (Defs.' Counter-Statement of Material Facts in Opp'n to Pls.' Mot. Summ. J. at ¶ 63). "Further investigation and discovery in this action have since revealed the prospect of collecting insurance proceeds after obtaining a large increase in policy limits under false pretenses as a financial motive for arson." (*Id.*) Second, Plaintiffs' characterization of the July 16, 2002, Supplementary Report of the Suffolk County Police Department's Arson Squad, in which they place great weight, is misleading. (*See* Exh. X, attached to Zola Affirmation.) The Court does not read the Supplementary Report to conclude that there are no leads or suspects in the fire, as do Plaintiffs. Rather, a balanced reading of the Report indicates that the Police Department (1) has not ruled out Patrick McEvoy as a possible suspect and (2) has no *new* suspects or leads.

Moreover, it is undisputed that Plaintiffs substantially increased the insurance coverage of the Property in 2002. This fact converges with the disputed fact of who, if anyone, required the increased coverage. And, also intertwined with the motivation issue is the determination of the

Property's fair market value.  The Court has already determined that these two issues are material, disputed, and preclude the granting of summary judgment to Defendants.  Therefore, the same now holds true for Plaintiffs' request of partial summary judgment as to Defendants' First Affirmative Defense.


CONCLUSION

At this juncture and for the foregoing reasons, Plaintiffs' Partial Motion for Summary Judgment is denied, and Defendants' motion for summary judgment is denied.  Plaintiffs' request for oral argument is denied as moot.  Per their letters dated May 24, 2006, the Parties are directed to mediate their dispute.


**SO ORDERED**.

Dated:  Central Islip, N.Y.
        September 19, 2006

                        /s/
                        Denis R. Hurley,
                        Senior United States District Judge